## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO.  05-198-01 (JGP) |
| | : | |
| v. | : | |
| | : | |
| ROSA CHAVEZ, | : | UNDER SEAL |
| | : | |
| Defendant. | : | |
| | : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its counsel, the United States Attorney for the District of Columbia, hereby submits in the above-referenced matter this memorandum in aid of sentencing of defendant Rosa Chavez.[1]  As discussed below, the government moves that the defendant receive a three-level reduction in her base offense level for acceptance of responsibility and that she be sentenced within the resulting United States Sentencing Guidelines range.

### I.  FACTUAL BACKGROUND

On July 26, 2005, defendant Rosa Chavez pled guilty before the Court to a one-count Indictment charging her with receipt of bribes by a public official, in violation of  18 U.S.C. § 201(b)(2)(A) and (C).

As agreed to by the defendant and set fort in the Statement of Offense and the Presentence Investigation Report ("PSR"), at pages 3-4, at all times material herein, defendant Chavez was employed as a Clerk with the District of Columbia Department of Motor Vehicles (hereinafter

---

[1]  The United States was notified by the court clerk's office that the file in this matter is under seal.  The United States will be filing a motion to unseal the file and the proceedings.

referred to as "DMV") at the main office at 301 C Street, N.W., in Washington, D.C.  Among the official duties of defendant Chavez was that of processing applications submitted by individuals seeking to obtain District of Columbia drivers' licenses.

Beginning in or about the early part of 2002, defendant Chavez began selling drivers' licenses.  Defendant Chavez told law enforcement that she began selling drivers' licenses to a primarily Hispanic clientele because she was "trying to help out."  Defendant Chavez stated that she was paid approximately $400 for each fraudulent license which she issued; however, some individuals indicated to her that they did not have that amount of money, and from these individuals she would accept $250.  The defendant Chavez input false claims into the DMV computer in order to create and issue the drivers' licenses, including claims:  (a) that she had received information that the applicant's out-of-state license had expired; (b) that the individual had passed the eye test; (c) that the applicant had submitted documentation of residency in the District of Columbia; and (d) that the applicant had passed the required written and road tests.  On occasions when the names provided by the individuals seeking the fraudulent licenses did not match the Social Security Numbers (SSN) or dates of birth, as indicated by the DMV computer, defendant Chavez would overlook the discrepancies, enter false justifications into the computer to attempt to explain the discrepancies and proceed to create and issue the fraudulent licenses.

Typically, defendant Chavez worked with a middle- man.  The middle-man solicited individuals in need of valid driver's licenses, but who, for a variety of reasons, could not or did not want to obtain such licenses through legitimate means.  Defendant Chavez was paid a portion of the overall bribe paid to the middle-man in order for her to produce the fraudulent licenses.  Frequently, the middle-man would pay her share of the bribe to her after work hours.  The number of fraudulent

2

drivers' licenses defendant Chavez issued fluctuated from week to week. However, initially in 2002, defendant Chavez issued, on average, three to four fraudulent drivers' licenses each week, and this number increased significantly over time.

During the course of the bribery scheme, "customers" seeking fraudulent licenses paid out more than $70,000 in bribes in order that Chavez produce the fraudulent drivers' licenses.

## II.  UNITED STATES SENTENCING GUIDELINES

The United States Sentencing Guidelines, § 3E1.1, provides for a two-level decrease in a defendant's offense level for acceptance of responsibility, and, upon motion of the government, for a defendant whose level is 16 or greater and who has in a timely manner advised the government of the defendant's intent to plead guilty, an additional one-level decrease. The defendant meets the criteria for a three-level decrease and the government hereby moves that she be given a three-level decrease in her offense level for acceptance of responsibility.

The probation officer believes, and the United States concurs, that the defendant's total offense level, incorporating the three-level decrease for acceptance of responsibility, is seventeen, her criminal history is I, and her guideline range is 24 to 30 months of imprisonment. PSR, at page 5 , ¶¶ 17-26, and page 9, ¶ 49. According to the PSR, the defendant presently falls within Zone D of the Sentencing Table, which requires a sentence of imprisonment. Id., at page 9, ¶ 54.

## III.  IMPACT OF U.S. v. BOOKER ON THE SENTENCING GUIDELINES

There are no facts involved in the calculation of defendant's sentence under the United States Sentencing Guidelines to which defendant did not admit in her guilty plea in this matter. Accordingly, there are no Sixth Amendment concerns in the calculation of her sentence under those Guidelines. However, the Supreme Court has now held that the Sentencing Guidelines are no longer

mandatory. Nevertheless, for the reasons set forth below, the government requests that the Court use the Sentencing Guidelines in determining the sentence of defendant in this case.

In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004). In consequence, the Court invalidated the statutory provision that made the Guidelines mandatory:  Title 18, United States Code, § 3553(b)(1).  Booker, 125 S. Ct. at 756; United States v. Price, 409 F.3d 436, 442-43 (D.C. Cir. 2005).  However, the Court expressly refused to invalidate the Guidelines in their entirety.  To the contrary, the Court upheld the remainder of the Guidelines as a benchmark for informing courts as to what would be a reasonable sentence for a particular defendant who has committed a particular crime.  The sentence will then be subject to review by courts of appeals for "reasonableness."  See Booker, 125 S. Ct. at 766; Price, 409 F.3d at 441, 442.

In Booker's wake, this Court must continue to resolve disputed questions of fact and law in order to calculate correctly a defendant's sentence under the existing Sentencing Guidelines.  See Fed. R. Crim. P. 32(i)(3)(B) (court must rule on unresolved objections to the Presentence Report or determine that resolution not necessary to sentencing). "The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." Booker, 125 S. Ct. at 767 (citing 18 U.S.C.A. §§ 3553(a)(4)&(5) (Supp. 2004)). See Price, 409 F.3d at 442-43.  In light of this mandate, it is plain that a sentence within the Guidelines, while not required, is presumptively reasonable.  Not only is a sentence within the Guidelines range presumptively reasonable, it also accommodates the salutary goal, endorsed by both Congress and the Supreme Court, of meting out fair and uniform sentences.

4

The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes, represent the distillation of two decades of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress. The Guidelines, consisting of offense characteristics and various grounds for departure, address the considerations relevant to sentencing, as articulated in Section § 3553(a), such as "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." See United States v. Price, 409 F.3d at 442 (listing the factors that guide sentencing).

Indeed, the Sentencing Commission formulated the Guidelines only after initially canvassing prior sentencing practices and attempting to identify and assign weights to all the factors – both aggravating and mitigating – that judges traditionally used in determining an appropriate sentence. See United States Sentencing Commission, Supplementary Report on the Initial Guidelines and Policy Statements 16-17 (1987); see also 28 U.S.C. 994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 168 (Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases"). Moreover, since the Guidelines were adopted, the Sentencing

Commission has continued to study district court and appellate sentencing decisions and to "modify its Guidelines in light of what it learns."  <u>Booker</u>, 125 S. Ct. at 766; <u>see</u> <u>id.</u> at 767 (Sentencing Commission will continue "collecting information about actual district court sentencing decisions . . . and revising the Guidelines accordingly").

It thus remains true that, absent unusual circumstances, the sentence in a criminal case should fall within the Guideline range as determined by this Court.  Every Supreme Court Justice in the various opinions in <u>Booker</u> recognized the express national policy goals, as articulated by Congress, that sentences be uniform across the country, to the extent possible, and that sentences be based on the offender's actual conduct and history.  <u>See</u>, <u>e.g.</u>, <u>id.</u> at 761 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); <u>id.</u> at 759 ("Congress' basic statutory goal – a system that diminishes sentencing disparity – depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction."); <u>id.</u> at 783 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); <u>id.</u> at 789 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity").  Since the Guidelines represent the only extant benchmark to encourage uniformity and thus the only tool to implement the Congressional vision of sentencing uniformity and fairness, Guidelines range sentences are currently the only mechanism available to implement Congress' basic statutory goals.

<u>Booker</u>, to be sure, departs from the prior practice of automatic reversal that would have accompanied the failure to sentence a defendant within the Guidelines.  Such a sentence will now

6

be reviewed instead for its "reasonableness." See id. at 766; Price, 409 F.3d at 441, 442. Nevertheless, the Guidelines – resulting as they do from years of study of sentencing practices, crime statistics, national crime policy, and consideration of the factors that inform sentencing, see 18 U.S.C. § 3553(a) – provide the most concrete yardstick against which to measure what would be reasonable. Booker not only prevents courts from substituting their individual judgment about the appropriateness of the Guidelines range without explaining with specificity their reasoning, Booker also continues to subject the explanation of the decision to sentence outside of the correctly calculated range to a court of appeals reasonableness review. See Section 3553(c) (mandating consideration of the Guidelines); Section 3553(c)(2) (mandating written explanations for imposing a sentence outside of the applicable Guideline range); Section 3742(f)(1) (mandating court of appeals to set aside a sentence imposed as a result of an incorrect application of the Guidelines); Section 3742(f)(2) (mandating court of appeals to set aside a sentence outside the Guidelines range when the district court fails to provide a required statement of reason in the judgment and commitment order).

        Fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing and should occur absent unusual circumstances. In this case, no unusual circumstances exist that warrant an exception to the preference for Guidelines sentencing. Therefore, the government respectfully recommends that the Court sentence defendant according to the Guidelines. Within that framework, the government requests, for the reasons discussed herein, that the Court sentence defendant within the resulting Sentencing Guidelines range.

## IV. RECOMMENDATION

        Defendant, a public official, pled guilty to accepting bribes in return for issuing Washington, D.C., drivers' licenses in fraudulent names. This conduct, especially in this day and age of identity

theft and other related crimes, is serious conduct that needs to be adequately punished. Such identifications can be used for numerous wrongful purposes including, among others, fraud against a variety of public and private organizations and institutions. Moreover, the corruption of a public service institution itself is a wrong. Corruption by public officials in the District of Columbia, at whatever level, is a serious and, unfortunately, too often recurring matter. Corruption erodes the public confidence in government officials, employees and institutions. Citizens will accept a system they believe operates fairly, but not one that they do not believe does so. Moreover, although most public servants are honest and hard working, their morale is hurt by those who engage in corruption and their reputations suffer.

In this case, the government is requesting that the Court sentence the defendant within the appropriate Guideline range of 24-30 months in Zone D. As to the appropriate sentence within the Guidelines, the government defers to the Court.

## V.  CONCLUSION

WHEREFORE, the government respectfully requests that the Court impose a sentence within the applicable Guidelines' range of 24 to 30 months.

Respectfully submitted,

KENNETH L. WAINSTEIN
UNITED STATES ATTORNEY
D.C. Bar Number 451058


By:    _____
ROBERT C. BOWMAN
D.C. Bar Number 417176
DANIEL P. BUTLER
D.C. Bar Number 417718
ASSISTANT U.S. ATTORNEYS
555 4th Street, N.W.
Washington, D.C. 20530
(202) 353-2877 and (202) 353-9431
Robert.C.Bowman@usdoj.gov
Daniel.Butler@usdoj.gov


## CERTIFICATE OF SERVICE

I hereby certify that a copy of Government's Unopposed Motion to Unseal the Criminal Information Plea Proceedings, and Future Proceedings in this Case has been sent by U.S. Mail to counsel for the defendant, Melvin L. Otey,  Esq., 3609 Georgia Ave., N.W., Suite 200, Washington, D.C.  20010, on this_____ day of November, 2005.


_____
ROBERT C. BOWMAN
DANIEL P. BUTLER
Assistant United States Attorneys

9